UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION



CHIA-CHI HO,

8059 Meadowcreek Dr.

Cincinnati, OH 45244


Plaintiff,


v.                                                          Case

No. 1:25-cv-00414


UNIVERSITY OF CINCINNATI,

ANASTASIOS ANGELOPOULOS

MATT SERRA

KASEY UNDERWOOD


2600 Clifton Ave

Cincinnati, OH 45220


Defendants.

AMENDED COMPLAINT WITH JURY DEMAND

Plaintiff Dr. Chia-Chi Ho brings this action under 42 U.S.C. § 1983, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Title IX of the Education Amendments of 1972, seeking damages and injunctive relief for Defendants' violations of her federal constitutional and statutory rights.

JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States.

2. Venue is proper in this District under 28 U.S.C. § 1391(b), as Defendants reside in this judicial district and the events giving rise to this action occurred in this judicial district.

3. Plaintiff seeks monetary damages, injunctive relief, declaratory relief, and attorney's fees under 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 20 U.S.C. § 1688.

PARTIES

4. Plaintiff Dr. Chia-Chi Ho is a resident of Cincinnati, Ohio, and was employed as a tenured professor in the Chemical and Environmental Engineering Department at the University of Cincinnati for 24 years until

her wrongful termination on February 21, 2025. She is the first female faculty member to receive tenure, the first to be promoted to professor, and the only female professor in Chemical Engineering.

5. Defendant University of Cincinnati ("UC" or "University") is a public university and instrumentality of the State of Ohio that receives federal funding, with its principal place of business in Cincinnati, Ohio.

INDIVIDUAL DEFENDANTS' ROLES AND ACTIONS

Defendant Anastasios Angelopoulos

6. Defendant Anastasios Angelopoulos is the Unit Head (Department Chair) of the Chemical and Environmental Engineering Department at the University of Cincinnati and is sued in his individual and official capacities.

7. Angelopoulos was the target of Plaintiff's Title IX complaint filed Dec 4, 2023, alleging discriminatory treatment, hostile work environment, and retaliatory conduct.

8. Despite being the subject of Plaintiff's Title IX complaint, Angelopoulos participated in and approved decisions to initiate disciplinary proceedings against Plaintiff, creating an inherent conflict of interest and violating due process.

9. On April 12, 2024, Angelopoulos sent Plaintiff an email related to a faculty development grant and mentioned he does not support her because

her summer assignment is in-person courses without extraordinary circumstances, despite knowing of her visual impairment disability and accommodation requests.

10. Upon information and belief based on standard university procedures and his role as Department Chair, Angelopoulos reviewed, recommended, or approved the following actions against Plaintiff:

a. The May 6, 2024, Initial Article 9 Notice alleging discipline for teaching one class via Zoom;

b. The May 15, 2024, Amended Article 9 Notice adding false allegations about company formation;

c. The August 2, 2024, proposal to terminate Plaintiff's employment;

d. The February 21, 2025, termination of Plaintiff's employment.

11. As Department Chair, Angelopoulos had direct supervisory authority over Plaintiff and was responsible for evaluating her performance, making recommendations regarding discipline, and participating in personnel decisions.

12. Angelopoulos had a personal motive to retaliate against Plaintiff because she had filed a Title IX complaint against him personally. His participation in disciplining his own accuser violated fundamental fairness and due process.

13. Angelopoulos facilitated the July 21, 2022, agreement with the University's Title IX office regarding teaching flexibility and accommodations for Plaintiff, but then disregarded that agreement when initiating and approving disciplinary proceedings in 2024.

14. Upon information and belief, Angelopoulos had actual knowledge of:

a. Plaintiff's Title IX complaint against him (because he was the subject). After participating in Plaintiff's termination, Angelopoulos was promoted from Department Head to Associate Dean. The University's promotion of Angelopoulos immediately after he participated in terminating the person who had filed Title IX complaints against him suggests institutional support for retaliation against Title IX complainants.

b. Plaintiff's accommodation requests for visual impairment (through his role as Department Chair and his April 12, 2024, email);

c. At least some of Plaintiff's OCR complaints (through standard university notification procedures to department heads);

d. The University's investigation of Plaintiff (through his participation in the Article 9 process).

15. Angelopoulos's personal stake in retaliating against his accuser removes his conduct from the intra-corporate conspiracy doctrine and establishes his personal liability.

Defendant Matt Serra

16. Defendant Matt Serra is Vice Provost for Academic Personnel at the University of Cincinnati and is sued in his individual and official capacities.

17. On or before May 6, 2024, Serra contacted the University of San Francisco School of Law registrar's office to inquire about Plaintiff's law school attendance, demonstrating that the University was actively

investigating Plaintiff's sabbatical activities before initiating disciplinary proceedings.

18. Serra's investigation of Plaintiff's law school attendance before initiating discipline demonstrates that the University's focus was on finding grounds to discipline Plaintiff, rather than addressing legitimate performance concerns.

19. Serra participated directly in the Article 9 investigation and disciplinary proceedings against Plaintiff. Upon information and belief based on his role as Vice Provost for Academic Personnel, Serra:

a. Reviewed and approved the May 15, 2024, Amended Article 9 Notice;

b. Participated in the decision to add false allegations about company formation to the charges;

c. Reviewed and approved the August 2, 2024, proposal to terminate Plaintiff;

d. Participated in the final decision to terminate Plaintiff's employment on February 21, 2025.

20. As Vice Provost for Academic Personnel, Serra had direct authority over faculty personnel matters, including disciplinary proceedings and termination decisions.

21. Upon information and belief, Serra had actual knowledge of:

a. Plaintiff's Title IX complaints (through his role overseeing academic personnel matters);

b. Plaintiff's accommodation requests (through his role and coordination with the Office of Accessibility Resources);

c. Plaintiff's OCR complaints (through standard university procedures requiring Vice Provost notification of federal complaints);

d. Plaintiff's law school attendance during her sabbatical (through his direct investigation, contacting the law school).

22. Serra's actions in investigating Plaintiff's sabbatical while simultaneously initiating discipline demonstrate retaliatory intent and coordination with other Individual Defendants.

23. Discovery will reveal the specific dates Serra learned of each of Plaintiff's protected activities and his specific communications with other Defendants regarding Plaintiff's complaints and the decision to discipline and terminate her.

Defendant Kasey Underwood

24. Defendant Kasey Underwood is Associate Director of Faculty Affairs and Academic Personnel at the University of Cincinnati and is sued in her individual and official capacities.

25. Around 2021, Underwood, together with the University's Title IX Coordinator, actively encouraged Plaintiff to file Title IX complaints against Plaintiff's ex-husband, Dr. Carlos Co. Plaintiff requested an informal resolution but was rejected. She stated Plaintiff that she would be protected from retaliation.

26. By virtue of encouraging Plaintiff to file Title IX complaints and her role in the Office of Faculty Affairs and Academic Personnel, Underwood had actual knowledge of:

a. All three of Plaintiff's Title IX complaints filed 2021-2023, including the specific identities of the accused (Angelopoulos and Dr. Co);

b. The substance of Plaintiff's complaints;

c. Plaintiff's subsequent OCR complaints (through her role handling federal compliance matters and standard procedures requiring Faculty Affairs notification);

d. Plaintiff's disability accommodation requests (through coordination between her office and the Office of Accessibility Resources).


27. Despite encouraging Plaintiff to file complaints and promising protection from retaliation, Underwood participated directly in retaliatory actions against Plaintiff, including:

a. Conducting or overseeing the Article 9 investigation into the allegations against Plaintiff;

2021-2022: NO discipline

2023: NO discipline (panel said "too severe")

2024: TERMINATION (just 6 weeks after "too severe" finding!)


b. Sending Plaintiff the preliminary findings on June 12, 2024;

c. Participating in the July 8, 2024, Article 9 meeting with Plaintiff;

d. Delivering the August 2, 2024, proposal to terminate Plaintiff's employment;

e. Delivering the February 21, 2025, notice of termination.

28. Underwood's conduct demonstrates a pattern of luring complainants into filing Title IX complaints, then participating in retaliating against those same complainants, in violation of Title IX and federal anti-retaliation protections.

29. As Associate Director of Faculty Affairs and Academic Personnel, Underwood had direct involvement in faculty disciplinary proceedings and was responsible for investigating allegations, preparing findings, and delivering disciplinary notices.

30. Underwood's role required her to be familiar with federal anti-discrimination and anti-retaliation laws, including Title IX, the ADA, and Section 1983. Her violation of Plaintiff's clearly established rights despite this knowledge demonstrates that she is not entitled to qualified immunity.

31. Discovery will reveal Underwood's specific communications with other Defendants regarding Plaintiff's protected activities and the coordination among Defendants to retaliate against Plaintiff.

FACTUAL ALLEGATIONS

Employment History and Disability

32. Dr. Ho was employed as a professor at UC for 24 years and was the first female tenured professor in the Chemical and Environmental Engineering Department.

33. Dr. Ho maintained an excellent teaching record for 21 years before 2021 and was elected as a Fellow of the Academy of Teaching and Learning, one of the highest honors in teaching excellence.

34. Dr. Ho was diagnosed with retinal detachment, Neovascular AMD, and Myopic Degeneration, resulting in permanent blind spots and reduced visual acuity, as documented by Dr. Jillian Zimmer on June 21, 2024.

35. Dr. Ho's visual impairments constitute a disability under the Americans with Disabilities Act, 42 U.S.C. § 12102, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 705.

Failure to Accommodate Disability - The Ten-Month Accommodation Catch-22

36. On May 7, 2023, Dr. Ho submitted an ADA Job Accommodation Request to the Office of Accessibility Resources, requesting reasonable accommodations, including Dragon speech-to-text software, to assist with her visual impairments.

37. The University approved Plaintiff's May 2023 accommodation request but failed to implement the accommodations promptly. Instead, the University initiated an investigation into Plaintiff's teaching performance before providing adequate accommodation.

38. On April 15, 2024, Dr. Ho submitted another accommodation request to the Office of Accessibility Resources, requesting the Fusion accessibility tool to assist with her visual impairments.

39. On approximately April 20, 2024, the Office of Accessibility Resources approved Plaintiff's request for the Fusion accommodation tool.

40. Despite approving the Fusion accommodation in April 2024, the University never provided the tool to Plaintiff before proposing her termination.

41. The University proposed Plaintiff's termination on August 2, 2024—more than three months after approving the Fusion accommodation—without ever providing the approved tool.

42. The University created an impossible situation where Plaintiff was expected to perform without accommodation.

43. The University terminated Plaintiff's employment on February 21, 2025—ten months after approving the Fusion accommodation—without ever providing the workable tool.

44. This accommodation catch-22—approving accommodations but never providing them, then terminating Plaintiff for performance issues while refusing to provide the very accommodations needed to address those issues—demonstrates disability discrimination and violates the ADA, the Rehabilitation Act, and the Fourteenth Amendment's Equal Protection and Due Process Clauses.

45. The University's delay in providing approved accommodations and its ultimate termination of Plaintiff without ever providing those

accommodations directly contributed to the circumstances for which she was terminated.

46. The University's conduct created a benefit (approved accommodation) and then deprived Plaintiff of that benefit without due process, violating the Fourteenth Amendment.

KNOWLEDGE ALLEGATIONS - Who Knew What and When

Underwood's Knowledge

47. Underwood had actual knowledge of all of Plaintiff's Title IX complaints because:

a. She actively encouraged Plaintiff to file the complaints in 2021 (¶ 25);

b. She worked directly with the Title IX Coordinator, who received the complaints.

c. Her role as Associate Director of Faculty Affairs and Academic Personnel includes oversight of Title IX matters and faculty personnel issues;

d. She personally assured Plaintiff that she would be protected from retaliation.

48. Underwood had actual knowledge of Plaintiff's OCR complaints because:

a. Federal complaints filed with OCR typically result in notification to the institution.

b. Her role in Faculty Affairs and Academic Personnel includes handling federal compliance matters.

c. Standard university procedures require reporting OCR complaints to Faculty Affairs.

d. Her direct involvement in the Article 9 investigation required knowledge of Plaintiff's complaint history.

49. Underwood had actual knowledge of Plaintiff's disability accommodation requests because:

a. Her office receives copies of accommodation approvals and works with the Office of Accessibility Resources.

b. The Article 9 investigation she conducted necessarily required reviewing Plaintiff's disability accommodations;

c. The preliminary findings she sent to Plaintiff on June 12, 2024, referenced Plaintiff's medical condition;

d. The July 8, 2024, Article 9 meeting she conducted with Plaintiff addressed accommodation issues.

50. Discovery will reveal the specific dates when Underwood learned of each protected activity, the documents she reviewed, and her communications with other Defendants regarding Plaintiff's complaints.

Angelopoulos's Knowledge

51. Angelopoulos had actual knowledge of Plaintiff's Title IX complaint against him because:

a. He was the subject of the complaint;

b. Title IX procedures require notifying accused parties and providing them an opportunity to respond;

c. The July 21, 2022, agreement facilitated by the Title IX office between Plaintiff and Angelopoulos explicitly referenced the complaint and established teaching accommodations (¶ 13);

52. Angelopoulos had actual knowledge of Plaintiff's disability accommodation requests because:

a. As Department Chair, he received notice of faculty accommodation needs affecting teaching assignments;

b. He sent the April 12, 2024, email directing Plaintiff's teaching assignments, demonstrating his knowledge of her accommodation situation;

c. His participation in the Article 9 disciplinary proceedings required knowledge of Plaintiff's disability and accommodations.

53. Upon information and belief, Angelopoulos knew of at least some of Plaintiff's OCR complaints because:

a. OCR typically notifies department heads when complaints involve departmental matters or department personnel;

b. His participation in disciplinary proceedings required knowledge of Plaintiff's complaint history;

c. Standard university procedures involve informing supervisors of federal complaints affecting their departments;

d. His personal stake as a target of Plaintiff's Title IX complaint motivated him to monitor her subsequent complaint activity.

54. Discovery will reveal the specific dates when Angelopoulos learned of each protected activity, his communications with other Defendants, and whether his personal animus as the target of Plaintiff's Title IX complaint motivated his participation in retaliating against her.

Serra's Knowledge

55. Serra demonstrated actual knowledge of Plaintiff's sabbatical activities by contacting the University of San Francisco School of Law registrar on or before May 6, 2024 (¶ 17), showing active investigation of Plaintiff before initiating discipline. He did not have any concern about the sabbatical as it was not he basis of the disciplinary action in the May 6, 2024 letter.

56. Upon information and belief, Serra had actual knowledge of Plaintiff's Title IX complaints and OCR complaints because:

a. His role as Vice Provost for Academic Personnel requires oversight of faculty disciplinary matters and federal compliance;

b. He participated directly in the Article 9 proceedings, which necessarily involved reviewing Plaintiff's complaint history;

c. Standard university procedures require Vice Provost notification when faculty file federal complaints or when the university receives OCR complaints;

d. His investigation of Plaintiff's sabbatical demonstrates he was actively gathering information about her.

57. Serra had actual knowledge of Plaintiff's disability accommodation requests because:

a. His role as Vice Provost for Academic Personnel involves coordination with the Office of Accessibility Resources on faculty accommodation matters;

b. His participation in termination decisions requires knowledge of disability accommodations;

c. The Article 9 proceedings in which he participated addressed accommodation issues.

58. Discovery will reveal the specific dates when Serra learned of each protected activity, what motivated his investigation of Plaintiff's law school attendance, and his communications with other Defendants regarding the decision to discipline and terminate Plaintiff.

Coordinated Action Based on Knowledge

59. The coordination among all three Individual Defendants, each with knowledge of Plaintiff's protected activities, demonstrates that it is plausible the disciplinary actions were motivated by retaliation and discrimination rather than legitimate concerns:

a. Angelopoulos, knowing he was accused in a Title IX complaint, participated in disciplining his accuser in violation of due process;

b. Underwood, having encouraged the complaints and promised protection, but did not investigate, and instead conducted the investigation leading to termination

c. Serra, knowing of Plaintiff's complaints and vision limitations, participated in investigations and did not voice concerns on sabbatical despite full knowledge.

DETAILED CHRONOLOGY OF PROTECTED ACTIVITY AND ADVERSE ACTIONS

Protected Activities - 2021

60. In 2021-2023, Plaintiff filed three Title IX complaints:

a. Title IX Complaint against Dr. Carlos Co (Plaintiff's ex-husband) in 2021, a faculty member in the same Chemical and Environmental Engineering Department, alleging domestic violence conduct;

b. Title IX Complaint against Defendant Angelopoulos, Dec 4, 2023, alleging discriminatory treatment, hostile work environment, and retaliatory conduct.

c. Title IX Complaint against Dr. Carlos Co in 2022 for hostile work environment.

61. None of these three Title IX complaints was properly investigated by the University. Instead of investigating the male faculty members who were the subjects of the complaints, the University began scrutinizing Plaintiff, the female complainant.

62. Underwood and the Title IX Coordinator encouraged Plaintiff to file these complaints and assured her she would be protected from retaliation (¶¶ 25, 47).

Protected Activities - 2022

63. On July 21, 2022, the Title IX office facilitated an agreement between Plaintiff and Angelopoulos regarding teaching flexibility and accommodations, acknowledging the Title IX complaint and establishing terms to address the concerns raised (¶ 13).

Protected Activities - 2023

64. On May 7, 2023, Plaintiff submitted an ADA Job Accommodation Request to the Office of Accessibility Resources, requesting Dragon speech-to-text software and other accommodations for her visual impairment disability (¶ 36).

65. On August 29, 2023, Plaintiff filed OCR Complaint No. 15-23-2236 with the U.S. Department of Education, Office for Civil Rights, regarding the University's failure to investigate her Title IX complaints and its pattern of retaliatory conduct.

Protected Activities - 2024

66. On April 15, 2024, Plaintiff submitted another accommodation request to the Office of Accessibility Resources, requesting the Fusion accessibility tool to assist with her visual impairments (¶ 38).

67. On approximately April 20, 2024, the University approved Plaintiff's request for the Fusion accommodation tool (¶ 39).

68. On July 1, 2024, Plaintiff filed OCR Complaint No. 15-24-2251 with the U.S. Department of Education, Office for Civil Rights, regarding the University's continuing retaliation and failure to provide approved accommodations.

Protected Activities - 2025

69. On December 6, 2024, Plaintiff filed OCR Complaint No. 15-25-2043.

70. On February 24, 2025, Plaintiff filed OCR Complaint No. 15-25-2115.

71. On April 1, 2025, Plaintiff filed OCR Complaint No. 15-25-2144.

Adverse Actions - 2024 and Temporal Proximity

72. On May 6, 2024—ONE MONTH after the University approved Plaintiff's Fusion accommodation request—the University initiated Article 9 disciplinary proceedings against Plaintiff, alleging insubordination for

teaching one single class remotely via Zoom. (Initial Article 9 Notice attached to Defendants' Motion to Dismiss as Ex. A).

73. The timing demonstrates temporal proximity: April 20, 2024 (accommodation approved) → May 6, 2024 (discipline initiated) = approximately two weeks.

74. On May 15, 2024—just NINE DAYS after the initial charges—the University completely changed course and amended the Article 9 Notice to add entirely different allegations, falsely claiming that Plaintiff "started a company" during her sabbatical. (Amended Article 9 Notice attached to Defendants' Motion to Dismiss as Ex. B).

75. This dramatic shift from one charge (single remote class) to a completely different false charge (company formation) in just nine days demonstrates that the charges were pretextual and that the University was manufacturing justifications to reach a predetermined outcome.

76. On June 12, 2024, Underwood sent Plaintiff the preliminary findings from the Article 9 investigation.

77. On June 20, 2024, a grievance panel determined that the proposed disciplinary letter against Plaintiff was too severe and reduced it to a warning, finding the University's proposed discipline excessive.

78. On July 8, 2024, Plaintiff met with Underwood and her union representative for the Article 9 meeting to respond to the allegations, but the

allegations did not include sabbatical misrepresentation, which was the basis the defendant stated (the motion to dismiss) as the reason for termination.

79. On August 2, 2024—ONE MONTH after Plaintiff filed OCR Complaint No. 15-24-2251 on July 1, 2024—the University proposed to terminate Plaintiff's employment. (Proposal of Discipline Letter attached to Defendants' Motion to Dismiss as Ex. C).

80. The timing demonstrates temporal proximity: July 1, 2024 (OCR complaint) → August 2, 2024 (termination proposed) = 32 days.

81. Critically, the University proposed termination on August 2, 2024— MORE THAN THREE MONTHS after approving the Fusion accommodation—without ever providing Plaintiff the approved accommodation tool (¶¶ 39-41).

82. The University created an impossible situation where Plaintiff was expected to perform without accommodations.

83. The University proposed termination despite the June 20, 2024, grievance panel finding that the proposed discipline was too severe, and before Plaintiff had a reasonable opportunity to implement the improvements recommended in the warning (¶ 77).

Adverse Actions - 2025

84. On February 21, 2025, the University terminated Plaintiff's employment—TEN MONTHS after approving the Fusion accommodation in April 2024—without providing Plaintiff the usable approved accommodation tool. (Termination Notice attached to Defendants' Motion to Dismiss as Ex. D).

ENHANCED COMPARATOR EVIDENCE - Similarly Situated Male Professor Treated Differently

Dr. Carlos Co - Male Faculty Member in the Same Department

85. Dr. Carlos Co is Plaintiff's ex-husband and a male faculty member in the same Chemical and Environmental Engineering Department at the University of Cincinnati.

86. Dr. Co was the subject of one of Plaintiff's Title IX complaints filed in 2021 (¶ 60(a)).

87. During the same general time period when Plaintiff was disciplined for teaching one single class via Zoom, Dr. Co taught his ENTIRE course load for an entire semester remotely without any disciplinary action or investigation by the University.

88. Dr. Co and Plaintiff are similarly situated in all relevant respects:

a. Both are/were tenured professors in the Chemical and Environmental Engineering Department;

b. Both report/reported to the same Department Chair (Defendant Angelopoulos);

c. Both teach/taught engineering courses to undergraduate and graduate students;

d. Both used remote delivery methods for their courses during overlapping time periods;

e. Both are subject to the same university policies regarding course delivery methods and teaching requirements;

f. Both are members of the same faculty union with the same collective bargaining agreement protections.

89. The sole material differences between Dr. Co and Plaintiff are:

a. SEX: Dr. Co is male; Plaintiff is female;

b. TITLE IX ROLE: Dr. Co was the SUBJECT of Plaintiff's Title IX complaint; Plaintiff was the COMPLAINANT who reported discrimination;

c. TREATMENT: Dr. Co taught remotely without consequences; Plaintiff was terminated for one remote class.

Pattern of Sex-Based and Retaliation-Based Disparate Treatment

90. After Plaintiff filed a Title IX complaint against Dr. Co in 2021:

a. Dr. Co was briefly suspended by the University.

b. The University reinstated Dr. Co without completing a thorough investigation of Plaintiff's complaint;

c. Dr. Co faced no long-term disciplinary consequences;

d. Dr. Co was subsequently permitted to teach an entire semester remotely without any discipline or investigation;

e. Dr. Co continues to be employed by the University as of the filing of this Complaint.

91. By contrast, after Plaintiff filed Title IX complaints (including against Angelopoulos and Dr. Co):

a. Plaintiff's complaints were not properly investigated;

b. Plaintiff, the complainant, faced escalating scrutiny and retaliation rather than protection;

c. Plaintiff was subjected to Article 9 disciplinary proceedings initiated by Angelopoulos, one of the individuals she accused.

d. Plaintiff was disciplined for teaching ONE single class remotely while Dr. Co taught an ENTIRE semester remotely without consequence;

e. Plaintiff was ultimately terminated.

92. Similarly, Defendant Angelopoulos, another male faculty member who was the subject of Plaintiff's Title IX complaint:

a. Was not disciplined or investigated for the conduct Plaintiff reported;

b. Was promoted after terminating Plaintiff;

c. Subsequently, participated in disciplining and terminating his accuser, creating a conflict of interest and demonstrating retaliation.

93. This pattern demonstrates both sex-based discrimination and retaliation:

a. Male faculty member who was the subject of a Title IX complaint (Dr. Co): Reinstated after a brief suspension, permitted to teach remotely without discipline, remains employed;

b. Male faculty member who was the subject of a Title IX complaint (Angelopoulos): Not investigated, disciplined, but participated in disciplining his accuser.

c. Female faculty member who was COMPLAINANT (Plaintiff): Not protected despite assurances, investigated and scrutinized, disciplined for conduct male faculty engaged in without consequence, and terminated.

94. Discovery will reveal:

a. Documentation of Dr. Co's remote teaching schedule and course delivery methods;

b. Any complaints received about Dr. Co's remote teaching or performance;

c. Whether any investigation was conducted regarding Dr. Co's remote teaching;

d. Communications among Defendants and other university officials showing awareness of different treatment based on sex and retaliation for Title IX complaints;

e. Whether other male faculty members taught remotely during the same period without discipline.

STRENGTHENED CAUSATION - Multiple Factors Supporting Inference of Unlawful Motive

95. Multiple factors, considered together, create a plausible inference that Plaintiff's termination and the adverse actions leading to it were motivated by retaliation for her protected activities and discrimination based on her sex and/or disability, rather than legitimate reasons:

Factor 1: Temporal Proximity

96. The timing of adverse actions immediately following protected activities establishes temporal proximity:

a. April 20, 2024: The Office of Accessibility Resources determined that Plaintiff's visual limitations could be accommodated → May 6, 2024: Discipline initiated (approximately 2 weeks);

b. July 1, 2024: OCR complaint filed → August 2, 2024: Termination proposed (32 days);

c. This constitutes "very close" temporal proximity establishing causation under Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008).

Factor 2: Shifting False Justifications Documented in Defendants' Own Exhibits

97. The University's inability to maintain consistent, truthful reasons for adverse action demonstrates pretext and unlawful motive:

a. May 6, 2024 (Initial Article 9 Notice): Single charge—teaching one class via Zoom;

b. May 15, 2024 (Amended Article 9 Notice): Just nine days later, a completely different charge—false allegation that Plaintiff "started a company";

c. August 2, 2024 (Proposal of Discipline): When false company allegations proved baseless, the University pivoted to "sabbatical misrepresentation"— despite the university president's approval and support letter for Plaintiff's sabbatical.

98. This pattern—documented in Defendants' own exhibits attached to their Motion to Dismiss—demonstrates wholesale abandonment of each justification when it proves untenable, followed by the manufacturing of new justifications. When an employer "cannot maintain a consistent, truthful reason for adverse action," a discriminatory or retaliatory motive becomes plausible. (Harris v. Wormuth, 669 F.Supp.3d 477 (2023); Vaughn v. Vilsack, 715 F.3d 1001 (2013))

Factor 3: Pattern of Investigating the Complainant Instead of the Accused

99. The University's pattern of investigating and disciplining the female complainant (Plaintiff) while not investigating or disciplining the male accused faculty demonstrates unlawful motive:

a. Three Title IX complaints filed against male faculty in 2021-2023 → none properly investigated;

b. Female complainant (Plaintiff) subjected to investigation and discipline instead;

c. Male accused (Dr. Co) reinstated and permitted to teach remotely without discipline;

d. Male accused (Angelopoulos) promoted and participated in disciplining his accuser.

Factor 4: Accommodation Catch-22

100. The University's conduct regarding disability accommodations demonstrates a discriminatory motive:

a. April 2024: Accommodation approved;

b. May 6, 2024: Discipline initiated without providing accommodation;

c. August 2, 2024: Termination proposed without providing accommodation;

d. August 2, 2024: Accommodations not provided;

e. February 21, 2025: Termination finalized—ten months after accommodation approval—without ever providing the approved tool.

101. This accommodation catch-22—approving accommodations, never providing them, using unaccommodated disability-related issues as a basis for termination, then revoking all accommodations—demonstrates disability discrimination.

Factor 5: Conflict of Interest - Angelopoulos Disciplining His Accuser

102. Angelopoulos's participation in disciplining the person who filed a Title IX complaint against him demonstrates both unlawful retaliation and due process violation:

a. Plaintiff filed a Title IX complaint against Angelopoulos in 2023;

b. Angelopoulos, as Department Chair, participated in or approved discipline against Plaintiff;

c. Allowing the accused to discipline his accuser violates fundamental fairness, and retaliation is a plausible scenario.

Factor 6: Comparative Evidence

103. The disparate treatment between similarly situated male and female faculty demonstrates sex-based discrimination:

a. Dr. Co (male, accused in Title IX complaint): Taught entire semester remotely without discipline, remains employed;

b. Plaintiff (female, Title IX complainant): Disciplined for one remote class, terminated.

Factor 7: Immediate Revocation of All Accommodations

104. The University's immediate revocation of ALL accommodations upon termination. Not providing accommodation contributes to conditions for termination.

Factor 8: Disregard of Grievance Panel Finding

105. The University proceeded with termination despite the June 20, 2024, grievance panel's finding that the proposed discipline was inappropriate (¶ 77), demonstrating that the termination was motivated by unlawful factors rather than legitimate performance concerns.

105a. Critically, neither the May 6 nor the May 15 Article 9 notices (Defendants' Exhibits A & B) cite "sabbatical misrepresentation" as a basis for discipline.

105b. ~~However, Defendants now contend that sabbatical misrepresentation~~ is the primary basis for termination. This charge appears nowhere in the formal notices, denying Plaintiff notice and opportunity to respond.

105c. This post-hoc addition of a new charge violates procedural due process. Plaintiff was never given notice of this charge and could not defend against it. This demonstrates manufactured justification and a predetermined outcome.

Conclusion on Causation

106. These eight factors, considered together, make retaliation and discrimination plausible and require discovery to resolve disputed questions of motive, knowledge, and causation. Courts recognize that causation "is fact-laden and inappropriate for a motion to dismiss at the pleadings stage." Causation is a question for the jury. (In re GEICO Customer Data Breach Litig., 691 F. Supp. 3d 624, 641 (D. Md. 2023; Johnson v. Yuma Regional Medical Center, 769 F.Supp.3d 936 (2024))

Title IX Protected Activities and Kasey Underwood's Role

107. The allegations regarding Plaintiff's Title IX complaints and Underwood's role are outlined in ¶¶ 25, 47-49, 60-62.

Sabbatical and False Accusations

108. In September 2022, Dr. Ho applied for and received approval for a sabbatical to "pursue study in the interface between technology and law."

109. The University's Dean and Provost approved this sabbatical application, with full knowledge of Plaintiff's intended activities. The university president provided a letter of recommendation and support for Plaintiff's law school attendance.

110. Dr. Ho openly disclosed her law school attendance to faculty and students on professional platforms like LinkedIn.

111. The University administration, specifically Defendant Serra, was aware of Dr. Ho's law school attendance on or before May 6, 2024, as evidenced by Serra's email exchange with the University of San Francisco School of Law registrar (¶ 17).

112. Dr. Ho's sabbatical activities directly benefited the University through the development of a new "Engineering Law & Policy" course, the implementation of innovative teaching methods, and the creation of frameworks to strengthen the University's technology transfer capabilities.

113. Despite presidential approval and the sabbatical report demonstrating achievement of stated objectives, the University manufactured false allegations about sabbatical "misrepresentation" as a pretextual justification for termination.

Improper Disciplinary Process and Due Process Violations

114. The allegations regarding the improper disciplinary process are outlined in ¶¶ 72-84 and 95-106.

115. The University's termination decision violated progressive discipline principles, due process requirements, and established University procedures.

116. Throughout this process, Defendants Angelopoulos, Serra, and Underwood acted in coordination to ensure Plaintiff's termination, despite the lack of legitimate grounds and in retaliation for Plaintiff's protected activities.

CAUSES OF ACTION

COUNT I: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT TITLE I

(42 U.S.C. § 12112)

117. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

118. The University is a covered employer with 15 or more employees subject to Title I of the ADA, 42 U.S.C. § 12111 et seq.

119. Plaintiff is a qualified individual with a disability who can perform the essential functions of her position as a professor with reasonable accommodation.

120. Title I of the ADA prohibits covered employers from discriminating against qualified individuals with disabilities in employment. 42 U.S.C. § 12112(a). This includes failure to make reasonable accommodations unless doing so would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

Title I Violations

121. The University violated Title I of the ADA, 42 U.S.C. § 12112, by:

   a. Approving but failing to provide reasonable accommodation promptly;

   b. Terminating Plaintiff while denying her necessary accommodations that would have enabled her to perform essential job functions;

   c. Using communication difficulties directly caused by unaccommodated visual impairment disability as grounds for termination;

   d. Immediately revoking all existing accommodations upon proposing termination, creating an impossible situation;

   e. Implementing a discriminatory review and disciplinary process that failed to account for Plaintiff's disability while accommodations remained unimplemented.

122. The University's accommodation catch-22—approving accommodations but never providing them, then terminating Plaintiff for performance issues while refusing to provide the very accommodations needed to address those issues—demonstrates intentional disability discrimination in violation of Title I.

123. The temporal sequence establishes the discriminatory nature of the University's conduct:

   a. April 2024: Fusion accommodation approved;

   b. May 6, 2024: Discipline initiated (approximately 2 weeks later);

   c. August 2, 2024: Termination proposed without providing accommodation (more than 3 months after approval);

   d. February 21, 2025: Termination finalized—ten months after accommodation approval—without ever providing the approved tool.

124. The University's delay in providing approved accommodations and its ultimate termination of Plaintiff without ever providing those accommodations directly contributed to the circumstances for which she was terminated.

125. The University's actions were intentional and demonstrated deliberate indifference to Plaintiff's rights under the ADA.

126. The University failed to engage in the interactive process required under the ADA to determine appropriate reasonable accommodations. Instead, the University approved accommodations and then failed to implement them while simultaneously initiating disciplinary proceedings.

127. As a direct and proximate result of the University's violations, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, reputational harm, and loss of her career.

Administrative Exhaustion

128. Plaintiff initially filed complaints with the U.S. Department of Education, Office for Civil Rights, beginning in August 2023.

129. The Office for Civil Rights transferred Plaintiff's employment-related disability discrimination claims to the Equal Employment Opportunity Commission pursuant to coordination procedures between OCR and the EEOC.

130. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and has received a right-to-sue letter as required under 42 U.S.C. § 12117(a), incorporating by reference the procedures of Title VII of the Civil Rights Act of 1964.

131. Plaintiff has satisfied all administrative prerequisites for bringing this Title I claim in federal court.

COUNT II: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

(29 U.S.C. § 794)

133. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

134. The University receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act.

135. Plaintiff is a qualified individual with a disability who can perform the essential functions of her position with reasonable accommodation.

136. Section 504 prohibits discrimination "solely by reason of" disability. 29 U.S.C. § 794(a).

137. The University discriminated against Plaintiff solely by reason of her disability by:

a. Approving but failing to provide accommodations for ten months;

b. Terminating her employment while refusing to implement approved accommodations;

c. Using disability-related communication difficulties as grounds for termination;

d. Creating an accommodation catch-22: terminating for performance issues while refusing to provide the tools needed to address those issues.

138. The temporal sequence demonstrates that disability was the sole cause:

a. April 2024: Accommodation approved;

b. May 6, 2024: Discipline initiated for one remote class (approximately 2 weeks later);

c. May 15, 2024: False allegations added;

d. August 2, 2024: Termination proposed without providing accommodation;

e. August 2, 2024: All accommodations immediately revoked;

f. February 2025: Terminated without implementing the workable approved tool (10 months after approval).

139. The University used Plaintiff's unaccommodated disability as the stated justification for termination (communication difficulties), making disability the sole cause regardless of any additional retaliatory motive.

140. Discovery will reveal whether disability was the sole cause or whether retaliation also motivated the adverse actions. However, the accommodation catch-22 and the use of unaccommodated disability-related issues as the termination basis establish that disability was at minimum the predominant and but-for cause.

141. Alternatively, to the extent this Court finds that multiple motivations preclude relief under Section 504's "solely" requirement, Plaintiff relies on her ADA Title II claim (Count I), which does not require sole causation.

142. The University's conduct was intentional and demonstrated deliberate indifference to Plaintiff's rights.

143. As a direct and proximate result, Plaintiff has suffered damages as described herein.

COUNT III: TITLE IX RETALIATION

(20 U.S.C. § 1681)

144. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

145. This Count is asserted against Defendant University of Cincinnati only. Title IX creates a cause of action against funding recipients, not individual employees. Soper v. Hoben, 195 F.3d 845, 854 (6th Cir. 1999). Individual Defendants' retaliatory conduct is addressed in Count VI (Section 1983 - First Amendment Retaliation).

146. The University receives federal financial assistance and is subject to Title IX, 20 U.S.C. § 1681 et seq.

147. Dr. Ho engaged in protected activity under Title IX by:

a. Filing Title IX complaints of sex discrimination against male faculty members in 2021 (¶¶ 60-61);

b. Filing complaints with the U.S. Department of Education, Office for Civil Rights (¶¶ 65, 68-71).

148. The University knew about Plaintiff's protected activities through Defendants Underwood (who encouraged the complaints), Angelopoulos (who was the subject of a complaint), Serra (through his role as Vice Provost), and the Title IX Coordinator.

149. The University, through Defendants acting in their official capacities and within the scope of their employment, retaliated against Plaintiff for her protected activities by:

a. Failing to properly investigate Plaintiff's Title IX complaints while investigating Plaintiff herself;

b. Allowing Angelopoulos, the subject of one of Plaintiff's Title IX complaints, to participate in disciplining his accuser;

c. Initiating disciplinary proceedings on May 6, 2024, following Plaintiff's protected activities;

d. Treating Plaintiff differently from similarly situated male faculty members, specifically Dr. Co, who was the subject of her Title IX complaint (¶¶ 85-94);

e. Escalating discipline through shifting false justifications despite Plaintiff's compliance with directives;

f. Proposing termination on August 2, 2024, one month after Plaintiff's July 1, 2024, OCR complaint;

g. Ultimately, Plaintiff, while the male faculty member she complained about (Dr. Co) was reinstated and remains employed, and while another

male faculty member she complained about (Angelopoulos) was promoted to Department Chair.

150. Multiple factors establish a causal connection between the Plaintiff's protected activities and the adverse actions:

a. Temporal proximity: April 2024 accommodation request → May 2024 discipline (weeks); July 2024 OCR complaint → August 2024 termination proposal (1 month);

b. Shifting false justifications documented in the University's own exhibits;

c. Pattern of investigating the complainant instead of the accused;

d. Comparative evidence showing disparate treatment;

e. Angelopoulos's personal conflict of interest;

f. Underwood's broken promise of protection.

151. The University's retaliatory conduct violated Title IX, 20 U.S.C. § 1681, and implementing regulations, 34 C.F.R. § 106.71.

152. The adverse actions constitute materially adverse actions that would dissuade a reasonable person from making or supporting a charge of

discrimination. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006).

153. As a direct and proximate result, Plaintiff has suffered damages as described herein.

COUNT IV: SECTION 1983 CIVIL RIGHTS VIOLATION - PROCEDURAL DUE PROCESS

(42 U.S.C. § 1983 - Fourteenth Amendment)

154. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

155. Defendants Angelopoulos, Serra, and Underwood acted under color of state law in their official capacities and are sued in both their individual and official capacities.

156. Plaintiff had a constitutionally protected property interest in her tenured position at the University. Board of Regents v. Roth, 408 U.S. 564 (1972).

157. Defendants deprived Plaintiff of her property interest without due process of law by:

a. Conducting a biased and predetermined investigation where Angelopoulos, the subject of Plaintiff's Title IX complaint, participated in disciplining his accuser;

b. Shifting justifications in nine days (May 6 to May 15) from one charge to completely different false charges, demonstrating a predetermined outcome;

c. Manufacturing false allegations (company formation) to justify predetermined discipline;

d. Disregarding the university president's approval and support of Plaintiff's sabbatical;

e. Proceeding with termination despite the June 20, 2024, grievance panel's finding that discipline was too severe;

f. Violating established University procedures and the Collective Bargaining Agreement;

g. Proposing termination before providing approved accommodations and before Plaintiff could implement recommended improvements;

h. Adding new charges after initial compliance to justify predetermined punishment.

158. The shifting justifications—from one remote class to false company formation to sabbatical misrepresentation (despite presidential approval)—documented in Defendants' own exhibits demonstrate that the process was pretextual and the outcome was predetermined. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

159. Allowing Angelopoulos to participate in disciplining the person who filed a Title IX complaint against him violates the fundamental due process requirement of an unbiased decision-maker. Withrow v. Larkin, 421 U.S. 35 (1975).

Clearly Established Law - No Qualified Immunity

160. The law was clearly established that:

a. Public employees have a property interest in continued tenured employment requiring a meaningful pre-deprivation process. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985);

b. Shifting, false justifications demonstrate a pretextual process violating due process. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000);

c. A biased decision-maker with a personal stake in the outcome violates due process. Withrow v. Larkin, 421 U.S. 35, 47 (1975);

d. Predetermined outcomes reached through manufactured charges violate due process. LaChance v. Erickson, 522 U.S. 262, 266-67 (1998).

161. A reasonable official in Defendants' positions would have clearly understood in 2024-2025 that:

a. Initiating discipline based on shifting false justifications violates due process;

b. Allowing an accused person (Angelopoulos) to participate in disciplining his accuser violates due process;

c. Manufacturing false charges (company formation) to reach a predetermined outcome violates due process;

d. Disregarding exculpatory evidence (the president's sabbatical approval) violates due process;

e. Adding new charges after compliance with initial charges violates due process.

162. Individual Defendants are therefore not entitled to qualified immunity. The rights violated were clearly established, and a reasonable official would have known the conduct violated those rights.

163. Defendants' actions violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

164. As a direct and proximate result, Plaintiff has suffered damages as described herein.

COUNT V: SECTION 1983 CIVIL RIGHTS VIOLATION - EQUAL PROTECTION

(42 U.S.C. § 1983 - Fourteenth Amendment)

165. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

166. Defendants, acting under color of state law, treated Plaintiff differently from similarly situated individuals without a rational basis, violating the Equal Protection Clause of the Fourteenth Amendment.

167. Specifically, Defendants permitted Dr. Carlos Co, a male professor in the same department, to teach an entire semester online without any discipline while subjecting Plaintiff to disciplinary proceedings and ultimate termination for teaching one class remotely (¶¶ 85-94).

168. Dr. Co and Plaintiff are similarly situated in all relevant respects: both are/were tenured professors in the same department, reporting to the same Chair, subject to the same policies, teaching similar courses, and using remote delivery methods during overlapping time periods (¶ 88).

169. The sole material differences are: (a) sex (Dr. Co is male, Plaintiff is female); (b) Title IX role (Dr. Co was the subject of Plaintiff's complaint, Plaintiff was the complainant); and (c) treatment (Dr. Co was not disciplined and remains employed, Plaintiff was terminated) (¶ 89).

170. More egregiously, after suspending Dr. Co following Plaintiff's Title IX complaint, Defendants reinstated him without a proper investigation while

simultaneously escalating disciplinary proceedings against Plaintiff (¶¶ 90-91).

171. Similarly, Defendant Angelopoulos, another male faculty member who was the subject of Plaintiff's Title IX complaint, was not disciplined but was promoted to Department Chair and participated in terminating his accuser (¶ 92).

172. This disparate treatment was based on Plaintiff's sex and her engagement in protected activities under Title IX. The pattern demonstrates that:

a. Male faculty who were subjects of Title IX complaints: not disciplined, promoted, permitted to teach remotely;

b. Female faculty who was the Title IX complainant: investigated, disciplined for the conduct male faculty engaged in, and terminated.

173. Defendants' actions lacked any rational basis and violated Plaintiff's constitutional rights to equal protection under the law.

Clearly Established Law - No Qualified Immunity

174. The law was clearly established that:

a. The Equal Protection Clause prohibits treating similarly situated individuals differently based on sex. United States v. Virginia, 518 U.S. 515, 532-33 (1996);

b. Treating a female complainant worse than a male accused in a discrimination context violates equal protection. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005);

c. Sex-based disparate treatment in employment requires heightened scrutiny. Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982).

175. A reasonable official in Defendants' positions would have clearly understood that:

a. Disciplining a female professor for one remote class while permitting a male professor to teach an entire semester remotely violates equal protection.

b. Terminating a female Title IX complainant while reinstating and protecting male faculty who were the subjects of her complaints violates equal protection;

c. Treating complainants worse than accused based on sex violates equal protection.

176. Individual Defendants are not entitled to qualified immunity.

177. As a direct and proximate result, Plaintiff has suffered damages as described herein.

## COUNT VI: SECTION 1983 CIVIL RIGHTS VIOLATION - FIRST AMENDMENT RETALIATION

(42 U.S.C. § 1983 - First Amendment)

178. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

179. Plaintiff's Title IX complaints, OCR complaints, and accommodation requests constitute protected speech under the First Amendment as they address matters of public concern regarding discrimination, retaliation, and misconduct in a public institution. Garcetti v. Ceballos, 547 U.S. 410 (2006); Connick v. Myers, 461 U.S. 138 (1983).

180. Complaints about discrimination and violations of federal law in a public educational institution constitute matters of public concern. (Seemuller v. Fairfax County School Bd., 878 F.2d 1578 (1989))

181. Plaintiff engaged in protected speech by:

a. Filing three Title IX complaints in 2021-2023 (¶¶ 60-61);

b. Filing OCR complaints in August 2023, July 2024, December 2024, February 2025, and April 2025 (¶¶ 65, 68-71);

c. Requesting disability accommodations in May 2023 and April 2024 (¶¶ 36, 38).

182. Defendants knew Plaintiff's protected speech through:

a. Underwood's direct involvement in encouraging the Title IX complaints (¶¶ 25, 47-49);

b. Angelopoulos being the subject of one of the complaints (¶¶ 51-54);

c. Serra's role as Vice Provost and his investigation of Plaintiff (¶¶ 55-57);

d. Standard university notification procedures regarding federal complaints.

183. Defendants retaliated against Plaintiff for her protected speech by:

a. Initiating discipline on May 6, 2024, approximately two weeks after accommodation approval;

b. Proposing termination on August 2, 2024, one month after the July 1, 2024, OCR complaint.

c. Subjecting her to increased scrutiny, shifting false charges, and manufactured allegations;

d. Using pretextual justifications to reach a predetermined outcome;

e. Ultimately terminating her employment on February 21, 2025.

184. Multiple factors establish a causal connection between Plaintiff's protected speech and the adverse actions (¶¶ 95-106):

a. Temporal proximity ("very close" under Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008));

b. Shifting false justifications proving pretextual motive (Harris v. Wormuth, 669 F.Supp.3d 477 (2023); Vaughn v. Vilsack, 715 F.3d 1001 (2013)

c. Pattern of retaliating against the complainant while protecting the accused;

d. Angelopoulos's personal stake in retaliating against his accuser;

e. Underwood's broken promise of protection;

f. Comparative evidence showing disparate treatment.

185. Defendants' retaliatory actions chilled and were intended to chill Plaintiff's exercise of her First Amendment rights. The termination of a

tenured professor for engaging in protected speech constitutes a materially adverse action that would dissuade a reasonable person from engaging in protected activity.

186. The adverse employment actions were substantially motivated by Plaintiff's protected speech. Mt. Healthy City Sch. Dist.. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Clearly Established Law - No Qualified Immunity

187. The law was clearly established that:

a. Retaliating against a public employee for filing discrimination complaints violates the First Amendment. Garcetti v. Ceballos, 547 U.S. 410, 425-26 (2006);

b. Title IX and discrimination complaints address matters of public concern protected by the First Amendment. (Seemuller v. Fairfax County School Bd., 878 F.2d 1578 (1989)

c. Temporal proximity plus shifting false justifications establish a retaliatory motive. Mt. Healthy City Sch. Dist.. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

188. A reasonable official in Defendants' positions would have clearly understood that:

a. Initiating discipline two weeks after an accommodation request constitutes retaliation;

b. Proposing termination one month after an OCR complaint constitutes retaliation;

c. Using shifting false justifications to discipline someone who filed discrimination complaints constitutes retaliation;

d. Allowing an accused person to participate in disciplining his accuser constitutes retaliation;

e. This conduct violates the First Amendment's prohibition on retaliation for protected speech.

189. Individual Defendants are not entitled to qualified immunity.

190. Defendants' actions violated Plaintiff's rights under the First Amendment to the United States Constitution.

191. As a direct and proximate result, Plaintiff has suffered damages as described herein.

COUNT VII: CONSPIRACY TO VIOLATE CIVIL RIGHTS

(42 U.S.C. § 1983)

192. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

Exception to Intra-Corporate Conspiracy Doctrine

193. While the intra-corporate conspiracy doctrine generally bars conspiracy claims against employees of the same entity, that doctrine does not apply when a defendant has a personal stake in the outcome independent of his official duties. Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003).

194. Defendant Angelopoulos had a personal stake in retaliating against Plaintiff that was independent of his official duties as Department Chair because:

a. Plaintiff filed a Title IX complaint against him personally in 2023, alleging discriminatory treatment, hostile work environment, and retaliation (¶¶ 7, 60(b));

b. His participation in disciplining Plaintiff was motivated by personal animus toward and self-protection from the person who accused him of wrongdoing;

c. His actions were taken to retaliate against his accuser, not to serve legitimate university interests;

d. His personal conflict of interest made his participation in disciplinary proceedings improper under any circumstances.

195. Angelopoulos acted outside the scope of his employment when he participated in a conspiracy to retaliate against a person who accused him of misconduct. His personal motive removes this case from the intra-corporate conspiracy doctrine.

196. Defendants Angelopoulos, Serra, and Underwood, acting in concert and under color of state law, conspired to violate Plaintiff's constitutional and statutory rights.

197. The conspiracy is evidenced by the coordinated nature of their actions, including:

a. Timing of investigations and discipline following Plaintiff's protected activities (¶¶ 72-84);

b. Serra's investigation of Plaintiff's law school attendance before initiating discipline (¶ 17);

c. Shifting justifications from one charge to completely different charges in nine days (¶¶ 73-75);

d. Angelopoulos's participation in disciplining his accuser despite obvious conflict of interest (¶¶ 8, 12);

e. Underwood's betrayal of her promise to protect Plaintiff after encouraging her to file complaints (¶¶ 25-28);

f. Disparate treatment compared to male faculty, particularly Dr. Co (¶¶ 85-94);

g. Addition of false allegations (company formation) after initial charges proved insufficient (¶ 74);

h. Proceeding with termination despite grievance panel findings in June 2024 (¶ 77);

i. Accommodation catch-22: approving accommodations but never providing them, then terminating for performance issues (¶¶ 36-45);

j. Coordinated efforts to manufacture justifications for predetermined punishment.

198. Each Defendant played a specific role in the conspiracy:

a. Angelopoulos, as Department Chair and the target of Plaintiff's Title IX complaint, initiated or approved discipline against his accuser and coordinated with other Defendants to justify predetermined punishment;

b. Serra, as Vice Provost, investigated Plaintiff's sabbatical, approved shifting false charges, and coordinated the termination decision;

c. Underwood, as Associate Director of Faculty Affairs, encouraged Plaintiff to file complaints while coordinating with other Defendants to retaliate against her, conducting the biased investigation, and delivering the termination notices.

199. Defendants reached an understanding to violate Plaintiff's rights and took overt acts in furtherance of the conspiracy, specifically the acts described in ¶¶ 6-31 and 72-116.

200. As a direct and proximate result of this conspiracy, Plaintiff has suffered damages as described herein.

COUNT VIII: SEX DISCRIMINATION UNDER TITLE VII

(42 U.S.C. § 2000e et seq.)

201. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

202. The University is a covered employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., employing more than fifteen employees.

203. Plaintiff is a member of a protected class under Title VII based on her sex (female).

204. Plaintiff was qualified for her position as a tenured professor in the Chemical and Environmental Engineering Department and performed her job satisfactorily for 24 years, including being elected as a Fellow of the Academy of Teaching and Learning.

Sex-Based Disparate Treatment

205. The University discriminated against Plaintiff based on her sex by treating her less favorably than similarly situated male employees, specifically Dr. Carlos Co, under nearly identical circumstances.

206. Dr. Co and Plaintiff are similarly situated in all material respects relevant to employment decisions:

   a. Both are/were tenured professors in the same Chemical and Environmental Engineering Department;

   b. Both report/reported to the same Department Chair (Defendant Angelopoulos);

   c. Both teach/taught engineering courses to undergraduate and graduate students;

   d. Both used remote delivery methods for courses during overlapping time periods;

   e. Both are subject to the same university policies, procedures, and collective bargaining agreement;

   f. Both hold/held the same rank and similar responsibilities.

207. Despite being similarly situated, the University treated Plaintiff and Dr. Co dramatically differently based on sex:

MALE FACULTY MEMBER (DR. CO):

a. Taught an entire semester of courses remotely without any investigation, discipline, or adverse action;

b. Was briefly suspended following Plaintiff's 2021 Title IX complaint but was quickly reinstated without completing a thorough investigation of the allegations;

c. Faced no long-term disciplinary consequences;

d. Continues to be employed by the University;

e. Was protected by the University despite being the subject of Title IX complaints.


FEMALE FACULTY MEMBER (PLAINTIFF):

a. Was subjected to Article 9 disciplinary proceedings for teaching a single class remotely;

b. Was investigated, scrutinized, and subjected to escalating discipline;

c. Was terminated from her 24-year tenured position;

d. Was retaliated against for filing Title IX complaints rather than being protected;

e. Faced manufactured charges and shifting justifications designed to reach a predetermined termination outcome.


208. The sole material difference between Dr. Co and Plaintiff that explains the disparate treatment is sex: Dr. Co is male, Plaintiff is female.

Pattern of Sex-Based Discrimination

209. The University's pattern of conduct demonstrates systemic sex-based discrimination:

a. When a male faculty member (Dr. Co) was accused of misconduct in a Title IX complaint, the University conducted a superficial investigation and reinstated him.

b. When a female faculty member (Plaintiff) filed Title IX complaints as the complainant, the University failed to properly investigate her complaints but instead investigated and disciplined her.

c. Male faculty who were subjects of Plaintiff's Title IX complaints (Dr. Co and Angelopoulos) were protected, promoted, or permitted to continue employment without consequence;

d. The female faculty member who complained (Plaintiff) was subjected to retaliation, manufactured charges, and ultimate termination.

210. This pattern reflects sex-based animus: the University treated male accused faculty members with leniency while treating the female complainant with hostility and severe discipline.

Sex-Based Hostile Work Environment

211. The University subjected Plaintiff to a hostile work environment based on her sex by:

a. Allowing Defendant Angelopoulos, a male faculty member whom Plaintiff accused of sex discrimination in a Title IX complaint, to participate in disciplining his female accuser;

b. Permitting Dr. Co, another male faculty member accused in Plaintiff's Title IX complaint, to teach remotely without discipline while simultaneously disciplining Plaintiff for the same conduct;

c. Creating a work environment where a female professor who reports sex discrimination is punished while the male faculty members she accused are protected and promoted;

d. Demonstrating to female faculty that filing complaints about male colleagues will result in retaliation rather than protection;

e. Treating Plaintiff as the problem rather than investigating the male faculty members she accused.

212. This conduct was sufficiently severe and pervasive to create an objectively hostile and abusive work environment that altered the terms and conditions of Plaintiff's employment.

213. The hostile environment was based on Plaintiff's sex and her engagement in opposing sex discrimination, culminating in her termination.

Pretext and Discriminatory Intent

214. The University's stated reasons for terminating Plaintiff are pretextual and mask sex-based discrimination, as demonstrated by:

a. Shifting false justifications documented in the University's own exhibits (¶¶ 97-98);

b. Terminating Plaintiff for conduct (remote teaching) that male faculty engaged in without consequence;

c. The temporal proximity between Plaintiff's Title IX complaints and the initiation of discipline;

d. The involvement of Angelopoulos, the male subject of Plaintiff's complaint, in terminating his female accuser;

e. The University's protection of male faculty who were subjects of complaints while terminating the female complainant;

f. The dramatic disparate treatment between Dr. Co (male, entire semester remote, no discipline) and Plaintiff (female, one class remote, terminated).

215. When an employer cannot maintain consistent, truthful reasons for adverse action and treats similarly situated employees of different sexes differently, discriminatory intent is established. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Causal Connection

216. Multiple factors establish that sex was a motivating factor in the University's decision to terminate Plaintiff:

a. Direct comparative evidence: Male faculty member (Dr. Co) engaged in identical conduct without discipline;

b. Statistical evidence: Plaintiff is the first and only female tenured professor in her department who has been terminated;

c. Temporal evidence: Discipline initiated shortly after Title IX complaints alleging sex discrimination;

d. Pattern evidence: Male accused faculty protected; female complainant terminated;

e. Procedural irregularities: Biased decision-maker (Angelopoulos) participating in terminating his accuser;

f. Pretext evidence: Shifting false justifications and manufactured charges.

217. These factors, considered together, demonstrate that sex was a motivating factor in Plaintiff's termination and other adverse employment actions. Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (direct evidence not required; circumstantial evidence sufficient).

Title VII Violation

218. The University violated Title VII, 42 U.S.C. § 2000e-2(a), by:

a. Discriminating against Plaintiff with respect to her terms, conditions, and privileges of employment because of her sex;

b. Subjecting Plaintiff to disparate treatment based on sex by disciplining and terminating her for conduct that male employees engaged in without consequence;

c. Creating and maintaining a hostile work environment based on sex;

d. Retaliating against Plaintiff for opposing sex discrimination (addressed separately in Title IX claim).

219. The University's discriminatory conduct was willful, intentional, and demonstrated reckless indifference to Plaintiff's federally protected rights.

Administrative Exhaustion

220. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging sex discrimination and other unlawful employment practices.

221. The EEOC issued a right-to-sue letter, and Plaintiff filed this action within 90 days of receiving the right-to-sue letter as required by 42 U.S.C. § 2000e-5(f)(1).

222. Plaintiff has satisfied all administrative prerequisites for bringing this Title VII claim.

Damages

223. As a direct and proximate result of the University's sex discrimination, Plaintiff has suffered and continues to suffer:

   a. Lost wages, salary, benefits, and other compensation from the date of termination through the present and into the future;

   b. Loss of tenure and the property interest in continued employment;

   c. Severe emotional distress, humiliation, mental anguish, and damage to professional reputation;

   d. Loss of career advancement opportunities and diminished future earning capacity;

   e. Other economic and non-economic damages.

224. The University's conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, warranting punitive damages to punish such conduct and deter similar future violations.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Chia-Chi Ho respectfully requests that this Court:

A. Enter judgment in her favor on all counts;

B. Issue a permanent injunction ordering her immediate reinstatement to her tenured faculty position with full back pay and benefits;

C. Award compensatory damages for:

1. Lost wages and benefits (past and future);

2. Emotional distress and mental anguish;

3. Reputational harm and diminished earning capacity;

4. Other economic and non-economic losses;

D. Award punitive damages against Individual Defendants Angelopoulos, Serra, and Underwood in their individual capacities for their willful violations of Plaintiff's constitutional rights;

E. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 20 U.S.C. § 1688;

F. Order Defendants to implement appropriate ADA accommodations and anti-retaliation policies;

G. Issue declaratory relief that Defendants' actions violated federal law;

H. Grant such other and further relief as this Court deems just and proper.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

_____/s/ Chia-Chi Ho_____

Chia-Chi Ho

Pro Se Plaintiff

8059 Meadowcreek Dr.

Cincinnati, OH 45244

chiachiho1@gmail.com

Dated: November 14, 2025

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on Nov 11, 2025 and will be sent by operation of the Court's electronic filing system to all other parties with access to this Court's ECF system, and the parties may access this filing through the Court's ECF system.

Further, a copy of the foregoing was served by e-mail to
"Scott H. DeHart" <shd@zrlaw.com>,
"Kenneth J. Hurley" kjh@zrlaw.com

_____/s/ Chia-Chi Ho_____